[Cite as *State v. Stefka*, 2012-Ohio-3004.]

STATE OF OHIO, MONROE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 10 MO 7 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| JERRY STEFKA, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from Common
Pleas Court, Case No. 2009-260.

JUDGMENT:     Affirmed.

APPEARANCES:
For Plaintiff-Appellee:     Attorney James L. Peters
Prosecuting Attorney
101 North Main Street, Room 15
P.O. Box 430
Woodsfield, OH 43793

For Defendant-Appellant:     Timothy Young
Ohio Public Defender
Terrence K. Scott
Assistant Ohio Public Defender
250 E. Broad St., Suite 1400
Columbus, OH 43215

JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Gene Donofrio

Dated: June 27, 2012

DeGenaro, J.

{¶1} Plaintiff-Appellant, Jerry Stefka, appeals the September 9, 2010 judgment entry convicting him of 14 counts of rape, 4 of which included a specification that the victim was under 10 years old; 13 counts of gross sexual imposition, and sentencing him accordingly. Stefka contends that the lack of specificity in the indictment violated his constitutional rights and that his convictions with regard to one of the victims, A.C., are against the manifest weight of the evidence.

{¶2} Stefka's arguments are meritless. The indictment adequately differentiates between counts based upon victim and time period so as to protect Stefka from double jeopardy. Stefka's convictions relating to A.C. are not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is affirmed.

### Facts and Procedural History

{¶3} During the summer of 2009, Stefka babysat the victims, A.C., P.C., and B.C., almost every weekend at his home. Stefka is the paternal uncle of the victims' father, Mr. C. On September 17, 2009, A.C., then age 10, blurted out to her stepmother, Mrs. C., that Stefka would get mad at her when she refused to "suck his wiener." Mrs. C. then spoke to P.C. and B.C., who also disclosed they had been abused by Stefka. Mrs. C. immediately called police to report the incident. That same day, Police Chief Chuck Hamilton interviewed each child individually. The children were subsequently taken to a hospital for examinations. The children reported that every weekend during the summer of 2009, Stefka forced them to engage in various forms of sexual contact and conduct, both with Stefka and with one another.

{¶4} At approximately 11:00 p.m. on September 17, 2009, Stefka was taken to the station by Chief Hamilton for questioning where he generally denied the allegations. Stefka was placed under arrest. According to Chief Hamilton, as they arrived at jail, Stefka confessed to the crimes. Search warrants issued for Stefka's house and computer were issued, however they yielded no additional evidence.

{¶5} As a result of the allegations, Stefka was indicted on 39 total counts: 26 counts of rape (R.C. 2907.02), 4 of which included a specification that the victim was under 10 years old; and 13 counts of gross sexual imposition (R.C. 2907.05(A)(4)). Stefka was arraigned, pled not guilty and counsel was appointed. Stefka moved to

dismiss the indictment on the grounds that "it is vague and ambiguous and does not set forth with sufficient specificity when or where said alleged criminal conduct occurred in a manner sufficient to permit defendant to prepare an adequate defense." The motion also included a request for a bill of particulars.

{¶6} The trial court denied the motion to dismiss the indictment, and granted the request for a bill of particulars, which the State filed. The case then proceeded to a jury trial.

{¶7} Mrs. C, the victims' stepmother testified that she used Stefka, her husband's uncle, to babysit P.C., A.C., and B.C., during the summer of 2009. She testified that the children stayed with Stefka two or three weekends per month during June, July, August and September 2009 and also for an entire week during June 2009, while Mrs. C gave birth to another child.

{¶8} On September 17, 2009, the girl, A.C., became upset and complained to her stepmother that everyone was always mad at her. When asked to elaborate, A.C. disclosed that Stefka would get mad at her when she refused to "suck his wiener." Mrs. C asked the other children about it and they confirmed the abuse; P.C. told Mrs. C that he did not like going to Stefka's house because Stefka would "gag" him with his penis.

{¶9} Mrs. C went to the police where Chief Hamilton interviewed each child separately. P.C., then 11 years old, reported to Chief Hamilton that they stayed at Stefka's home every weekend during the summer of 2009, from Friday to Sunday, and that Stefka would force them to touch his penis, write on him with a marker, and that he would gag them with his penis. P.C. said that both he and his siblings were forced to perform fellatio on Stefka "every weekend." He said Stefka would make them kiss him and that he threatened to spit in their mouths. Stefka also made B.C. and P.C. perform fellatio on one another, and made them urinate in his mouth. P.C. also disclosed that Stefka inserted his finger and penis into his anus and that Stefka made the children masturbate. He said that Stefka threatened to hurt them if they told anyone about the abuse. He also reported that Stefka once shoved a peanut butter and jelly sandwich down his throat all at one time, and also shoved a hot grilled cheese sandwich down his throat, burning him.

**{¶10}** A.C., then 10 years old, reported to Chief Hamilton that they would go almost every weekend during the summer of 2009 to Stefka's house and that Stefka forced her and her brothers to perform fellatio on him "every weekend." When Chief Hamilton asked her if she was forced to perform fellatio on Stefka that past weekend, she said "yes, three or four times." With regard to other conduct that summer, A.C. told Chief Hamilton that Stefka touched her in her "private area," digitally penetrated her anus two times, and made her touch her brothers, and vice versa, five times.

**{¶11}** B.C., then 9 years old, told Chief Hamilton that they would go to Stefka's house every weekend from Friday evening until Sunday at noon and that Stefka would make them perform fellatio on him and manipulate his penis. According to B.C., Stefka would give them a quarter "every weekend" when they would do that to him. He told Chief Hamilton that if "white stuff" came out, he and A.C. would have to drink it and that Stefka would give them a dollar. He said Stefka forced him and his brother to put their faces in A.C.'s "butt," and forced all of them to draw on Stefka's penis with a marker. He also told Chief Hamilton that Stefka made him urinate in his mouth and P.C. had to both urinate and defecate in Stefka's mouth.

**{¶12}** Chief Hamilton brought Stefka in for questioning at approximately 11:00 p.m. that same evening. Stefka was able to walk unaided from his house, and down some steps to the police vehicle. Prior to questioning, Stefka waived his *Miranda* rights. During a recorded interview, Stefka initially denied the allegations, but admitted he had sexual thoughts about children. By the end of the interrogation, Stefka stated that if he did abuse the children, he did not remember it. A DVD of this interview was entered into evidence and played for the jury at trial.

**{¶13}** Stefka was placed under arrest and transported to jail. According to Chief Hamilton, as they arrived at the jail, Stefka told him "the more I think about it I probably did do what they said but I need a psychiatrist and an attorney." This statement was not recorded.

**{¶14}** Larry Hootman, a crime scene agent from the Ohio Bureau of Criminal Investigation and Identification (BCI) testified that he subsequently executed a search on

Stefka's home but did not recover any physical evidence, such as semen. He felt that the extremely cluttered, "deplorable" condition of the house hindered his ability to locate such evidence.

**{¶15}** Debra McCormick, RN, a sexual assault nurse examiner, testified that she interviewed and examined each victim separately at the Southeastern Ohio Regional Medical Center on September 19, 2009, two days after the allegations had been reported to police. She noted that the manner of abuse disclosure by young children can vary from patient to patient, and that young children would typically disclose to her the aspects of the abuse that hurt them the most.

**{¶16}** First McCormick interviewed P.C. who reported to her that he and his siblings would go to Stefka's home on the weekends and that Stefka made them do "bad things," which included inserting a finger into P.C.'s anus. P.C. reported that Stefka would pinch him and threaten to hurt him more if he disclosed the abuse. McCormick did not discover any physical trauma on P.C.'s body during the examination, however, she stated this was not uncommon since the genital and anal areas heal quickly, especially in young children. The record of her examination of P.C. was admitted into evidence.

**{¶17}** Second, McCormick examined A.C., who disclosed that Stefka made her perform oral sex on him and that she became frustrated and finally told her stepmother because it had been going on for so long. McCormick found no signs of trauma on A.C., but testified that this was not unusual for the type of rape alleged. McCormick's report with regard to A.C. was admitted into evidence.

**{¶18}** Finally, McCormick examined B.C., who disclosed basically the same conduct that his brother P.C. did. Specifically, B.C. told McCormick that Stefka penetrated B.C.'s anus with a finger and that he was forced to kiss his uncle's breast. He reported that Stefka forced him to "play with" Stefka's penis and color on him with a marker. B.C. also reported that Stefka forced him to perform fellatio. She found no trauma on B.C., but again was not surprised by this. McCormick's report with regard to B.C. was admitted into evidence.

**{¶19}** McCormick further testified that she asked the children how often the abuse

occurred and they told her it happened every weekend.

{¶20} All three children testified at trial, and their testimony was consistent with what they reported to McCormick and Chief Hamilton. B.C. testified that he and his siblings stayed at Stefka's home "almost every weekend" during the summer of 2009, a weekend meaning Friday evening through Sunday. While there, he and P.C. slept on the floor in the living room, while A.C. slept on the loveseat. B.C testified that the abuse occurred in the living room, dining room and sometimes in the upstairs playroom. Photographs of the home were introduced as exhibits and showed that the house was extremely cluttered and messy.

{¶21} As far as Stefka's specific conduct, B.C testified that Stefka would force him and his siblings to "play with" his penis and that Stefka "gagged" them with his penis by shoving their open mouths onto it. Sometimes Stefka would ejaculate. B.C. testified that Stefka would give them money for performing these acts. B.C. said he was also forced to suck Stefka's nipple, and that Stefka forced him and P.C. to touch each other's penises. Stefka also made them "put each other's faces in each other's butts." Stefka forced B.C. and P.C. to urinate on Stefka and Stefka would drink it. Finally, B.C. testified that Stefka touched his "butt," "in the middle of it." B.C. testified that the abuse happened every time they were at Stefka's house, beginning when Stefka's live-in companion Mary would go to church on Friday evenings. Stefka told them that if they said "no," they would be forced to do it many more times. Stefka threatened to hurt them if they told anyone of the abuse. B.C. saw Stefka hurt his brother P.C. by throwing him onto a chair. Stefka also pinched B.C.'s penis.

{¶22} A.C. testified that they stayed at Stefka's often during the summer of 2009, mostly on the weekends. She stated that Stefka would "always have [them] play with his private parts," and that they would always have to "tug on" Stefka's penis and "he'd always have us gag, he'd push our heads right down on it [his penis.]" Stefka would also have her bend over so that he could stick his finger in her anus. A.C. said she observed Stefka do the same things to her brothers, and that Stefka would give them quarters to do the "bad stuff."

{¶23} A.C. also testified that the abuse would commence when they arrived at

Stefka's house on Friday evenings: "He'd have us play games for a little bit and then he'd start telling us to do something very bad." Stefka's live-in companion, M.B. would be at church, in her bedroom or showering when the abuse took place. Stefka would also hurt A.C. by pulling her hair and pinching her arms and legs. She did not tell her parents about the abuse for a long time because she was afraid of Stefka. A.C. testified that the abuse occurred in the kitchen, dining room, living room, play room and clothes room. She confirmed that the house was extremely messy.

{¶24} P.C. testified that when they stayed at Stefka's house during the summer of 2009, Stefka would force them to "play with" his penis, by sucking it and touching it with their hands, and that sometimes Stefka ejaculated. Stefka paid them fifty cents for doing this. P.C. said they would have to kiss Stefka and that he would threaten to spit in their mouths. P.C. stated that Stefka put his finger and his penis in P.C.'s anus; made him and B.C. draw on him with a marker; forced him and B.C. to urinate in his mouth; and made him and B.C. perform fellatio on one another.

{¶25} After the State rested, defense counsel renewed his objection to the lack of specificity of the indictment.

{¶26} Stefka then presented his defense. His theory of the case was that the children fabricated the allegations in order to avoid having to go to his home, which admittedly was in a very poor, extremely cluttered condition. He also claimed he did not have the opportunity to abuse them because his live-in companion was usually at home and because he had a recent hip injury that rendered him physically unable to abuse the children in an upstairs room as they contended.

{¶27} Stefka's live-in companion M.B. suffered from a mental illness and her condition had apparently deteriorated significantly after Stefka's arrest, so she was not called to testify. Stefka himself did not testify. Instead he presented two witnesses in his defense, his friend, B.G., and his sister, V.C.

{¶28} B.G. testified that she stayed with Stefka and M.B. from October 2008 until June 2009. During that time period, the children were there almost every weekend. She said she slept near the children and never witnessed Stefka make any inappropriate

advances towards them. B.G. testified that Stefka had mobility issues due to a hip injury, and that she was primarily responsible for caring for the children. On cross, B.G. admitted that by the time she moved out in June 2009, Stefka was getting around with a cane. She said that Stefka was taking pain medication for his hip and also drinking 2 to 3 beers per day. She admitted she served time in prison for drug trafficking, and that while she lived with Stefka he asked her to purchase crack cocaine for him, which she refused to do. She admitted she purchased women's clothing for Stefka, upon his request.

**{¶29}** Finally, V.C., who is Stefka's sister, and also the paternal grandmother of the victims, testified. She said she used Stefka as a babysitter for her own children many years ago without reservation. She stated she never knew Stefka to be involved with or have a desire for children. She said that Mr. and Mrs. C. would leave the children with Stefka on the weekends so they could go places without them. She confirmed that Stefka broke his hip in 2008, but was out of the nursing home by September 2008. She claimed that Stefka was using a cane in June 2009 and could not go up the stairs. She never saw Stefka make any advances toward the children during the summer of 2009. On cross, V.C. admitted she came to Stefka's house while police were conducting their search and told one of the officers that if the children said it happened, it must have happened, and that "[her] grandchildren don't lie." At the time she made that comment she was unaware of the exact allegations, but knew they involved sex with the children.

**{¶30}** The defense rested and renewed the objection to the indictment for the record, which was again overruled by the trial court. After considering all of the evidence, the jury convicted Stefka of 14 counts of rape, 4 with a specification that the victim was under 10 years old; and 13 counts of gross sexual imposition. The jury acquitted Stefka of 12 counts of rape.

**{¶31}** On September 9, 2010, Stefka's sentencing hearing was held, and the trial court sentenced Stefka to 4 concurrent life sentences without parole; 10 additional life sentences to be served concurrently to the first 4 sentences; and 13 consecutive 5-year sentences (totaling 65 years), to be served consecutively to the concurrent life sentences. Stefka was also sentenced to five years of mandatory post-release control for the GSI convictions, and classified as a Tier III sex offender.

**Specificity of Indictment**

{¶32} In his first of two assignments of error, Stefka asserts:

{¶33} "The trial court erred by convicting Jerry Stefka based upon multiple counts of a single offense, denying him due process of law and violating the Double Jeopardy Clause. Fifth and Fourteenth Amendments, United States Constitution; Section 10, Article I, Ohio Constitution. (August 30, 2010 Transcript Vol. II, pp.62, 66, 72, 85, 98, 100, 103, 132, 134, 136, 137); (September 28, 2009 Indictment); (June 21, 2011 Judgment Entry of Sentence Nunc Pro Tunc)."

{¶34} Stefka challenges the sufficiency of his indictment. As a threshold matter, the State's contention that Stefka failed to raise this issue below is erroneous; Stefka raised the issue in a pretrial motion to dismiss and renewed his objections during trial. We review the sufficiency of an indictment de novo. *State v. Hayes*, 7th Dist. No. 07-MA-134, 2008-Ohio-4813, ¶30, citing *State v. Smith*, 4th Dist. No. 06CA7, 2007-Ohio-502, ¶26.

{¶35} The United States Supreme Court has held that [a]n indictment is sufficient if it (1) contains the elements of the charged offense; (2) gives the defendant adequate notice of the charges; and, (3) protects the defendant against double jeopardy. *Russell v. U.S.* (1962), 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240.

{¶36} First, the indictment against Stefka does contain pertinent language for each of the charged offenses. Counts 1, 4, and 7 allege that during June of 2009, Stefka engaged in sexual conduct with and "purposely compelled" B.C., A.C., and P.C., respectively, "to submit by force or threat of force," with the said child being less than 13 years of age. Counts 10, 13 and 16 allege that during July of 2009, Stefka "engaged in sexual conduct with" and "purposely compelled" B.C., A.C., and P.C., respectively, "to submit by force or threat of force," with the said child being less than 13 years of age. Counts 19, 22, and 25 allege that during August of 2009, Stefka engaged in sexual conduct with and "purposely compelled" B.C., A.C., and P.C., respectively, "to submit by force or threat of force," with the said child being less than 13 years of age. Counts 28, 31, and 34 allege that during September 2009, Stefka "engaged in sexual conduct with"

and "purposely compelled" B.C., A.C., and P.C., respectively, "to submit by force or threat of force," with the said child being less than 13 years of age. *See* R.C. 2907.02. Of the above, Counts 1, 10, 19 and 28 included the additional specification that the victim, to wit, B.C., was under 10 years of age at the time the acts occurred.

**{¶37}** Counts 2, 5, and 8 allege that during June 2009, Stefka "engage[d]" in sexual conduct with" B.C., A.C., and P.C., respectively, "not the spouse of the said Jerry Stefka" with the said child "being less than 13 years of age." Counts 11, 14, and 17 allege that during July 2009, Stefka "engage[d]" in sexual conduct with" B.C., A.C., and P.C., respectively, "not the spouse of the said Jerry Stefka" with the said child "being less than 13 years of age." Counts 20, 23, and 26 allege that during August 2009, Stefka "engage[d]" in sexual conduct with" B.C., A.C., and P.C., respectively, "not the spouse of the said Jerry Stefka" with the said child "being less than 13 years of age." Counts 29, 32, and 35 allege that during September 2009 Stefka "engage[d]" in sexual conduct with" B.C., A.C., and P.C., respectively, "not the spouse of the said Jerry Stefka" with the said child "being less than 13 years of age." *See* R.C. 2907.02. Stefka was acquitted of these twelve counts.

**{¶38}** Counts 3, 6 and 9 allege that during June 2009, Stefka had "sexual contact" with B.C., A.C. and P.C., respectively, "not the spouse of the said Jerry Stefka" with the said child "being less than 13 years of age * * * whether or not the said Jerry Stefka knows the age" of said child. Counts 12, 15, and 18 allege that during July of 2009, Stefka had "sexual contact" with B.C., A.C., and P.C., respectively, "not the spouse of the said Jerry Stefka" with the said child "being less than 13 years of age * * * whether or not the said Jerry Stefka knows the age" of said child. Counts 21, 24 and 27 allege that during August 2009, Stefka had "sexual contact" with B.C., A.C., and P.C., respectively, "not the spouse of the said Jerry Stefka" with the said child "being less than 13 years of age * * * whether or not the said Jerry Stefka knows the age" of said child. Counts 30, 33 and 36 allege that during September 2009, Stefka had "sexual contact" with B.C., A.C., and P.C., respectively, "not the spouse of the said Jerry Stefka" with the said child "being less than 13 years of age * * * whether or not the said Jerry Stefka knows the age" of said child. *See* R.C. 2907.05(A)(4).

**{¶39}** Finally, Count 37 alleges that during the summer of 2009 Stefka "engage[d] in sexual conduct with PC and the said Jerry Stefka purposely compelled PC to submit by force or threat of force and the said PC being less than thirteen years of age * * *." *See* R.C. 2907.02. Count 38 alleges that during the summer of 2009 Stefka "engage[d] in sexual conduct with PC and the said Jerry Stefka purposely compelled PC to submit by force or threat of force and the said PC being less than thirteen years of age * * *." *See* R.C. 2907.02. And Count 39 alleges that during the summer of 2009, Stefka "cause[d] PC and BC to have sexual contact and the said PC and BC being less than thirteen (13) years of age, whether or not the said Jerry Stefka knows the age of PC and BC." Thus, the indictment contained the pertinent statutory language for each of the charged offenses, thus passing the first prong of the *Russell* test.

**{¶40}** The crux of Stefka's argument relates to the second prong of the *Russell* test; specifically, he contends that the indictment failed to provide him with "adequate notice of the charges," and therefore failed to protect him against double jeopardy. *Id.* In support of this argument, Stefka relies heavily on *Valentine v. Konteh*, 395 F.3d 626 (6th Cir.2005), along with several Eighth District cases following *Valentine*: *State v. Hlavsa*, 8th Dist. No. 93810, 2011-Ohio-3379, and *State v. Hemphill*, 8th Dist. No. 85431, 2005-Ohio-3726. Specifically, Stefka argues that the 39 counts in his indictment were not distinct enough so as to compose separate counts.

**{¶41}** In *Valentine*, the defendant was charged with 20 identically-worded counts of child rape and 20 identically-worded counts of felonious sexual penetration of a child. No attempt was made to differentiate any of the counts, either in the bill of particulars or at trial. At trial, the child victim was able to testify to "about twenty" occasions of forced fellatio and "about fifteen" instances of vaginal penetration. No other evidence as to the number of instances was presented. Moreover, all of the charges in *Valentine* were based on the same time frame of abuse. The jury convicted Valentine of all 40 counts. *Id.* at 629.

**{¶42}** The federal district court granted Valentine's writ of habeas corpus, finding that the identically-worded counts in the indictment deprived Valentine of his due process

rights to notice of the charges against him. The Sixth Circuit affirmed, noting that because the 40 counts "were not anchored to forty distinguishable criminal offenses, Valentine had little ability to defend himself." *Id*. at 633. Valentine was convicted "for a generic pattern of abuse rather than for forty separate abusive incidents." *Id*. at 634.

{¶43} In *Hemphill*, the defendant was indicted on 33 counts of gross sexual imposition, along with multiple counts of other offenses. Presumably there was no bill of particulars filed as this was not mentioned in the opinion. Concerning the gross sexual imposition counts, the state presented the testimony of the victim who stated that Hemphill rubbed her chest "[a]ny chance he got." As for actual numbers or specific testimony, the only additional testimony was when the state asked her, "Would he-did he touch your breast at least 33 times?" and she replied, "Yes."

{¶44} The Eighth District, applying more of a sufficiency analysis, concluded that this testimony alone was insufficient to support the multiple counts indicted, explaining:

> Although we can appreciate the difficulty of prosecuting a case involving a reticent victim who appears to be unsupported by her family, this cannot lessen the state's burden of proof as to each individual offense. Accordingly, inasmuch as our analysis is governed by the Court's holding in *Valentine*, supra, we cannot accept the numerical estimate which is unconnected to individual, distinguishable incidents. We therefore find that there is an insufficient factual basis for defendant's convictions on these unspecified offenses.
>
> "Our further review of the record establishes, however, that a rational trier of fact could have found the essential elements of gross sexual imposition beyond a reasonable doubt, from the first incident (involving defendant's request to get him socks).
> " * * *
> "Accordingly, defendant's conviction for one count of gross sexual imposition, one count of rape of a girl under thirteen with the furthermore clause alleging force, and one count of rape with the furthermore clause

alleging force, are all supported by sufficient evidence. We hereby vacate defendant's convictions for the remaining offenses. *Hemphill.* at ¶88-89, 93.

**{¶45}** In *Hlavsa*, the indictment charged the defendant with multiple, undifferentiated counts of rape and GSI of his minor niece, over roughly a 15-month period. Hlavsa did not request a bill of particulars, nor move to dismiss the indictment. The jury convicted Hlavsa of 17 counts of rape; 13 counts of gross sexual imposition ("GSI") of a child under the age of 13; 16 counts of GSI of a child over the age of 13; and 17 counts of kidnapping. The jury acquitted Hlavsa of 14 counts of rape of a child under the age of 13 and two counts of GSI of a child over the age of 13. Relying on *Valentine*, Hlavsa asserted that the carbon-copy counts in the indictment failed to provide him adequate notice because they did not connect each rape and GSI count to a distinct and differentiated incident.

**{¶46}** The Eighth District agreed, applying a plain error standard and concluding that the victim's testimony regarding the abuse consisted in part of estimates that were not specific enough so as to identify the acts to support some of the convictions. *Id.* at ¶4, 10-22. As a result, the court affirmed 15 rape convictions and 3 GSI convictions but reversed as to 2 rape convictions and the remaining 10 GSI convictions. *Id.* at ¶23.

**{¶47}** Stefka's reliance on *Valentine* and its progeny is misplaced for several reasons. As an initial matter, as the federal district court recently noted in *Lawmill v. Pineda*, N.D.Ohio No. 1:08 CV 2840, 2011 WL 1882456 (May 17, 2011), the United States Supreme Court has "invalidated the reasoning behind one of the major grounds for the *Valentine* decision." *Id.* at *5, citing *Renico v. Lett*, —— U.S. ——, ——, 130 S.Ct. 1855, 1866, 176 L.Ed.2d 678 (2010). The court explained:

> *Valentine* relied primarily on *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), and applied the three criteria for the sufficiency of an indictment established in that case. Although the Valentine court recognized, as is discussed in more detail below, that the

federal right to a grand jury has never been found to be incorporated against the states, it cited several United States Circuit Court cases that have found that the same due process requirements set forth in *Russell* should be applied to state criminal charges. Following the decision in *Valentine*, however, the Supreme Court has clarified that any reliance on a circuit court decision, including that Circuit's own precedent, when determining what is "clearly established" federal law is error under the AEDPA standard [that is, the Antiterrorism and Effective Death Penalty Act of 1996, which altered the standard of review that a federal court must apply when deciding whether to grant a writ of habeas corpus]. *Renico v. Lett*, ─── U.S. ────, ────, 130 S.Ct. 1855, 1866, 176 L.Ed.2d 678 (2010).

The Sixth Circuit has not relied on or even cited its own holding in *Valentine* since *Renico* was decided. In fact, this Court could only find three Sixth Circuit cases citing *Valentine* prior to the *Renico* decision, and the *Valentine* holding was followed in only one. The single Sixth Circuit case following *Valentine* was the case of *U.S. v. Madison*, 226 Fed. Appx. 535 (2007), which involved a federal indictment for tax evasion and other related crimes. *Valentine* has not again been applied to bar a state conviction in a habeus *[sic]* action under the AEDPA. (Footnotes omitted.) *Lawmill* at *2.

**{¶48}** And as this court has previously explained, Ohio state courts are not bound by the *Valentine* decision. *State v. Clemons*, 7th Dist. No. 10 BE 7, 2011-Ohio-1177, ¶8, fn. 2.

**{¶49}** Further, *Valentine* is factually distinguishable from the present case in three major respects: (1) the indictment here did distinguish the various counts; (2) the bill of particulars provided more distinguishing details about the crimes; and (3) the evidence presented at trial demonstrated that there were more instances of the crimes than were charged, not less. *See State v. Garrett*, 7th Dist. 08-BE-32, 2010-Ohio-1550, ¶27 (similarly distinguishing *Valentine*). Further distinguishing *Valentine* is the fact that there

were corroborating witnesses in the present case. *See Clemons* at ¶39 supra (distinguishing *Valentine* based on corroborating evidence.)

**{¶50}** First, the indictment provided Stefka with notice of the charges against him. As a threshold matter, "specificity as to time or date is not required as these are not elements of the offense." *Clemons* at ¶37, citing R.C. 2941.03(E) (an indictment or information is sufficient if it can be understood therefrom that the offense was committed at some time prior to the time of the indictment). Further, cases involving sexual abuse of children often cannot be charged with a high level of specificity with regard to the time of the abuse. In such cases, the State must set forth a time frame and charge a defendant for offenses occurring within that time frame. *See State v. Lawrinson* (1990), 49 Ohio St.3d 238, 551 N.E.2d 1261 (a certain degree of inexactitude is permissible in cases of a young child-victim of sex offenses). *See, also, State v. Daniel*, 97 Ohio App.3d 548, 647 N.E.2d 174 (10th Dist.1994). The problem with the indictments in *Valentine*, *Hemphill* and *Hlavasa* were that they provided *no differentiation* between the various counts. By contrast, the indictment in this case differentiated the counts by month, victim, and age of victim.

**{¶51}** Specifically, Stefka was charged with one count of rape by force of a child under thirteen, one count of rape of a child under thirteen, and one count of gross sexual imposition, *per victim*, *per month* (June, July, August and September of 2009.) The rape charges against P.C. included the specification that he was under the age of 10 at the time of the offenses. Additionally, Stefka was charged with two counts of forcible rape regarding P.C. during the summer of 2009 and one count of GSI involving both P.C. and B.C. during the summer of 2009. Thus, the charges in this case are unlike the "carbon-copy" counts at issue in *Valentine*, *Hemphill* and *Hlavasa*.

**{¶52}** Second, unlike in *Valentine*, there was a bill of particulars in this case that further differentiated the counts in the indictment. On July 8, 2010, the State filed a bill of particulars that reads as follows.

**{¶53}** With regard to Counts 1, 2, 4, 5, 7, 8, 10, 11, 13, 14, 16, 17, 19, 20, 22, 23, 25, 26, 28, 29, 31, 32, 34, 35 it states:

During the month of June 2009, while Defendant was watching the children at this residence, he, on several occasions forced BC to perform oral sex on him, pushing BC's mouth onto his penis, causing BC to gag. Also, Defendant similarly forced AC and PC to do the same thing, again pushing their mouths onto his penis. Such acts with all of the children occurred several times during the month of June 2009.

During the month of July 2009, while Defendant was watching the children at this residence, he, on several occasions, forced BC to perform oral sex on him, pushing BC's mouth onto his penis, causing BC to gag. Also, Defendant similarly forced AC and PC to do the same thing, again pushing their mouths onto his penis. Such acts with all of the children occurred several times during the month of July 2009.

During the month of August 2009, while Defendant was watching the children at this residence, he, on several occasions forced BC to perform oral sex on him pushing BC's mouth onto his penis, causing BC to gag. Also, Defendant similarly forced AC and PC to do the same thing, again pushing their mouths onto his penis. Such acts with all of the children occurred several times during the month of August 2009.

During the first two (2) weekends of September 2009, while Defendant was watching the children at this residence, he, on several occasions forced BC to perform oral sex on him pushing BC's mouth onto his penis, causing BC to gag. Also, Defendant similarly forced AC and PC to do the same thing, again pushing their mouths onto his penis. Such acts with all of the children occurred several times during the first two (2) weekends of September 2009.

**{¶54}** With regard to Counts 3, 12, 21 and 30, it states:

During the months of June, July and August and during the first two (2) weekends of September, 2009, on several occasions, Defendant touched

BC's penis with his hand and forced him to suck Defendant's nipples. Defendant also forced BC to draw with a marker on Defendant's back, legs, stomach and penis. On one occasion, Defendant made BC put his penis near Defendant's mouth and urinate. All of these acts occurred at the Defendant's residence described above.

**{¶55}** With regard to Counts 6, 15, 24 and 33, it states:

During the months of June, July and August and during the first two (2) weekends of September, 2009, on several occasions, Defendant touched AC in her vaginal area, both on top of and under her clothing. All of these acts occurred at the Defendant's residence described above.

**{¶56}** With regard to Counts 9, 18, 27, and 36 the bill of particulars states:

During the months of June, July and August and during the first two (2) weekends of September, 2009, on several occasions, Defendant made PC lick Defendant's genital area, as well as Defendant's nipples. Defendant also forced PC to draw with a marker on Defendant's back, legs, stomach and penis. Defendant made PC masturbate Defendant with his hand until Defendant ejaculated. All of these acts occurred at the Defendant's residence described above.

**{¶57}** Regarding Count 37, the bill of particulars states: "During the summer of 2009, Defendant made PC pull down his pants and Defendant forcibly inserted his penis into PC's anus. This act occurred at Defendant's residence described above." Regarding Count 38, it states: "During the summer of 2009, Defendant made PC pull down his pants and Defendant inserted his finger into PC's anus. This act occurred at Defendant's residence described above." Finally, with regard to Count 39, the bill of particulars states: During the summer of 2009, Defendant made BC and PC touch each others genital areas with their mouths while Defendant watched. This act occurred at Defendant's residence

as described above."

{¶58} Regarding all of the counts, the bill of particulars states: "On many occasions during the summer of 2009, Defendant threatened the children, telling them that if they told or if they didn't do what he asked, he would make them do it many more times."

{¶59} The bill of particulars did not "merely restate" the allegations contained in the indictment, which was one of the problems in *Valentine*. *Valentine* at 628. The bill of particulars here is similar to that in *Garrett*, supra. That is, it "explicitly detailed the type of sexual contact and conduct, how it started * * * and how long it continued." *Garrett* at ¶37. In *Garrett* this court distinguished *Valentine* on this (and other) bases and upheld Garrett's convictions. *Id.* at ¶27, 37.

{¶60} Third, the evidence presented at trial demonstrated that there were *more* instances of the crimes than were charged, not less. The children testified that they were at Stefka's house almost every weekend during June, July, and August 2009 and for the first two weeks of September 2009. Even taking the slightly lower estimation by the stepmother, two or three weekends per month, the children were at Stefka's home and subjected to the abuse at least two weekends per month. The children uniformly testified and/or reported to the police that the abuse—which included forced touching of Stefka's penis and forced fellatio—occurred every weekend that they stayed at Stefka's home.

{¶61} More specifically, both B.C. and A.C. testified that the abuse occurred every time they were at Stefka's home for the weekend, beginning when M.B., Stefka's live-in companion, would leave the house to go to church on Friday evenings. A.C. testified that Stefka would "*always*" force them to "play with his private parts," and that they would "*always*" have to "tug on" his penis and he'd *always* make us gag," pushing "our heads down on it [on his penis]" A.C. reported to Chief Hamilton that *every weekend* Stefka would force her to put his penis in her mouth. When asked if Stefka put his penis in her mouth the last weekend they stayed at his house (the weekend of September 11-13, 2009), she replied, yes three or four times. B.C. also reported to Chief Hamilton that the forced fellatio would occur every weekend. McCormick, the sexual assault nurse

examiner also testified that the children told her that the abuse occurred every weekend.

**{¶62}** The evidence presented demonstrates that the abuse occurred *more* than just the once per month per victim for which Stefka was charged. Further, the three victims corroborated the abuse allegations, providing consistent testimony, often with the same corroborating details. In all of these ways, the present case is distinguishable from the situation presented in *Valentine* along with the Eighth District cases cited by Stefka.

**{¶63}** Regarding Counts 37, 38 and 39 of the indictment which alleged two rapes and a GSI "during the summer of 2009," there was testimony about each specific incident. P.C. testified that during the summer of 2009, Stefka made P.C. pull down his pants and Stefka inserted his finger and the tip of his penis into P.C. anus. This was additional conduct beyond the forced oral sex that occurred every weekend in June, July, August and September 2009. There was also testimony from P.C. and B.C. that Stefka made them touch each other's genital areas with their mouths while Stefka watched.

**{¶64}** As an additional point, this court has noted that some courts apply a sufficiency analysis to indictment challenges such as this one. *Clemons* at ¶43, citing *State v. Salahuddin*, 8th Dist. No. 90874, 2009-Ohio-466, ¶15, *State v. Warren*, 168 Ohio App.3d 288, 2006-Ohio-4104, 859 N.E.2d 998, ¶20; and *Hemphill* at ¶89. Based on the discussion above, Stefka's convictions would also survive a sufficiency review.

**{¶65}** Sufficiency of the evidence is a legal question dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). A conviction cannot be reversed on this ground unless the court determines, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found that the elements of the offense were proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). Here, based on the testimony of Chief Hamilton, the sexual assault nurse, and the children themselves, any rational fact-finder could have found Stefka guilty of 4 counts of rape with the specification that the victim was under ten years old; 10 counts of rape, and 13 counts of gross sexual imposition.

**{¶66}** Based on the above, the indictment in the present case protects Stefka against double jeopardy. The indictment differentiates counts based upon victim and time

period, and the bill of particulars further differentiates the counts based on more specific conduct. This is sufficient to protect Stefka against a subsequent prosecution for this conduct. The indictment here passes the test articulated in *Russell.* Accordingly, Stefka's first assignment of error is meritless.

### Manifest Weight

{¶67} In his second and final assignment of error, Stefka asserts:

{¶68} "The trial court violated Jerry Stefka's rights to due process and a fair trial when it entered judgments of conviction for rape and gross sexual imposition that were against the manifest weight of the evidence. Fifth and Fourteenth Amendments, United States Constitution; Section 16, Article I, Ohio Constitution. (August 30, 2010 Transcript Vol. I pp. 9, 16, 27, 37, 47, 216); (August 31, 2010 Transcript Vol. II pp. 14, 16, 38, 42-125, 130, 131, 132); State's Ex. 1"

{¶69} "Weight of the evidence concerns the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other." (Emphasis sic.) *Id.* A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. Id. This is so because the triers of fact are in a better position to determine credibility issues, since they personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

{¶70} To determine whether a verdict is against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶71} Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the

factfinder lost its way.' " *State v. Pallai*, 7th Dist. No. 07 MA 198, 2008-Ohio-6635, ¶31, quoting *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶81 (2d Dist.). In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99 CA 149, 2002-Ohio-1152, ¶13, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶72}** Here Stefka only challenges his convictions relating to A.C. as against the manifest weight of the evidence. (Counts 4, 16, 13, 15, 22, 24, 31 and 33.) With regard to A.C., Stefka was convicted of four counts of rape by force or threat of force of a child under 13, (R.C. 2907.02), and four counts of gross sexual imposition (R.C. 2907.05(A)(4)). Each rape and GSI count corresponded to a different month during the summer of 2009: June, July, August, and September, respectively.

**{¶73}** With regard to the rape convictions, R.C. 2907.02(A)(2) provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" is defined as, inter alia, "fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A)

**{¶74}** With regard to the GSI convictions, R.C. 2907.05(A)(4) provides:

No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

**{¶75}** "Sexual contact" is defined as " touching of an erogenous zone of another,

including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶76} Stefka asserts that the evidence presented in support of the convictions regarding A.C. was unclear, uncertain and unreliable. Specifically, Stefka contends that A.C.'s testimony regarding the frequency and timing of the sexual conduct and contact was vague. Stefka further contends that Chief Hamilton's testimony about Stefka's confession lacks probative value because it was not recorded.

{¶77} Stefka's arguments are meritless. The record is replete with credible evidence supporting these convictions. To start, A.C. was the one who spontaneously disclosed the abuse to her stepmother. That same day, the children were separately interviewed by Chief Hamilton, and during which A.C. stated that the children were present at Stefka's house almost every weekend during the summer of 2009, and that the abuse would occur every weekend:

> [Chief Hamilton]: [I asked her] [w]hen were you at Uncle Jerry's last? Her answer was this past Sunday. Did Uncle Jerry put his wiener [as she called it] in you mouth this past weekend? And she stated, yes, three or four times.
> My next question was how often does this happen at Uncle Jerry's. Her answer was it happens every weekend. (Vol. III, 21)

{¶78} With regard to Stefka's other conduct, A.C. disclosed to Chief Hamilton that Stefka touched her in her private area, stuck his finger in her anus two times, and that she was forced to touch her brothers in their private areas five times. Further, A.C. testified that every time they went to Stefka's house, they had to "tug on" or suck Stefka's penis.

{¶79} The above testimony is supported by the statements and testimony of A.C.'s brothers, who also stated that the abuse occurred every weekend during the summer of 2009 at Stefka's home. Often the testimony and statements by the boys contained

corroborating details about the abuse. For example, all of the children testified that every weekend Stefka "gagged" them with his penis, and made the children manually manipulate his penis. Several of the children even testified and/or disclosed to Chief Hamilton details about the appearance or taste of Stefka's ejaculate.

{¶80} Finally, according to Chief Hamilton, Stefka confessed to the crimes while being transported to jail, stating "the more I think about it I probably did do what they said but I need a psychiatrist and an attorney." Whether or not to believe the Chief's testimony, along with the testimony of all the victims, fell squarely within the province of the jury. The jury reasonably concluded that testimony was credible.

{¶81} In sum, the jury did not lose its way in convicting Stefka of four counts of rape and four counts of GSI regarding A.C. Accordingly, Stefka's second assignment of error is meritless.

## Conclusion

{¶82} Both of Stefka's assignments of error are meritless. The indictment adequately differentiates counts based upon victim and time period so as to protect Stefka from double jeopardy. Stefka's convictions relating to A.C. are not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is affirmed.

Waite, P.J., concurs.

Donofrio, J., concurs.